1   ROBERT A. SIEGEL (S.B. #64604)
    rsiegel@omm.com
2   O'MELVENY & MYERS LLP
    400 South Hope Street, 18th Floor
3   Los Angeles, CA  90071-2899
    Telephone:     213-430-6000
4   Facsimile:     213-430-6407

5   ADAM P. KOHSWEENEY (S.B. #229983)
    akohsweeney@omm.com
6   SUSANNAH K. HOWARD (S.B. #291326)
    showard@omm.com
7   O'MELVENY & MYERS LLP
    Two Embarcadero Center, 28th Floor
8   San Francisco, CA  94111-3823
    Telephone:     415-984-8912
9   Facsimile:     415-984-8701

10  Attorneys for Defendant
    US Airways, Inc.

11

12              **UNITED STATES DISTRICT COURT**

13             **NORTHERN DISTRICT OF CALIFORNIA**

14               **SAN FRANCISCO DIVISION**

15

16

17  JOSEPH TIMBANG ANGELES, NOE          Case No. 3:12-cv-05860 CRB
    LASTIMOSA, on behalf of themselves and
18  on behalf of others similarly situated, and   **DEFENDANT US AIRWAYS, INC.'S**
    the general public,                  **NOTICE OF MOTION TO DECERTIFY**
19                                       **THE GRACE PERIOD SUBCLASSES**
                  Plaintiffs,
20                                       Hearing Date:  November 18, 2016
         v.                              Time:  10:00 A.M.
21                                       Courtroom:  6
    US AIRWAYS, INC., and DOES 1         Judge:  Hon. Charles R. Breyer
22  through 50,
                  Defendants.
23

24

25

26

27

28

1   **TO PLAINTIFF JOSEPH TIMBANG ANGELES AND NOE LASTIMOSA AND THEIR**

2   **ATTORNEYS OF RECORD IN THIS ACTION:**

3       **PLEASE TAKE NOTICE** that on Friday, November 18, 2016, at 10:00 A.M., or as soon

4   thereafter as this matter may be heard in Courtroom 6 of the above-entitled Court, located at 450

5   Golden Gate Avenue, San Francisco, California, 94109, Defendant US Airways, Inc.

6   ("Defendant" or "US Airways") will move, and hereby affirmatively does move, pursuant to Rule

7   23 of the Federal Rules of Civil Procedure and governing case law to decertify Subclasses 2 and 3

8   (the "Grace Period Subclasses"), as certified by the Court in its April 4, 2014 Order (Dkt. 75), as

9   well as Subclasses 4-7 to the extent they depend upon the Grace Period Subclass.

10       The Grace Period Subclasses should be decertified because they do not satisfy either the

11   commonality requirement of Rule 23(a)(2) or the predominance and superiority requirements of

12   Rule 23(b)(3).  This is because, *inter alia*, US Airways' "grace period" policy is lawful and

13   because post-certification discovery confirms that there is no common method of determining, on

14   a classwide basis, whether any unconverted grace period minutes actually represent compensable

15   work time.  As a result, resolving Plaintiffs' Grace Period Claim for all class members will

16   require individual, fact-based inquiries, necessitating over 500 mini-trials, which would be

17   unmanageable.

18       Because the Grace Period Subclasses do not satisfy the requirements of Rule 23,

19   Subclasses 4-7, which depend upon the Grace Period Subclasses, should also be decertified.

20       Defendant's Motion is based on this Notice of Motion and Motion; Defendant's

21   supporting Memorandum of Points and Authorities; the Declaration of Susannah K. Howard and

22   supporting exhibits, all pleadings and papers on file with the Court in this action; and such other

23   matters as may be presented to the Court at or before the hearing of this Motion.

24

25

26

27

28

1

2     Dated:  October 7, 2016

3                                                          O'MELVENY & MYERS LLP
                                                           ROBERT A. SIEGEL
4                                                          ADAM P. KOHSWEENEY
                                                           SUSANNAH K. HOWARD

5

6                                                          By:___/s/ Adam P. KohSweeney_____
                                                                  Adam P. KohSweeney
7                                                          Attorneys for Defendant US Airways, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**TABLE OF CONTENTS**

**Page**

STATEMENT OF FACTS AND PROCEDURAL HISTORY .................................................... 1

    I.      FLEET SERVICE SCHEDULING AND WORK DUTIES ................................. 1

    II.     GRACE PERIODS AND REPORTING ADDITIONAL WORK TIME ............. 2

    III.    CLASS CERTIFICATION ................................................................................. 4

ARGUMENT ............................................................................................................................. 5

    I.      THE GRACE PERIOD SUBCLASSES DO NOT SATISFY THE
            REQUIREMENTS OF RULE 23 AND THEREFORE MUST BE
            DECERTIFIED .................................................................................................. 5

         A.     The Grace Period Subclasses Do Not Satisfy The Commonality
                Requirement of Rule 23(a)(2) ...................................................................... 5

              1.     There is No Common Policy Capable of Resolving the
                     Claims of the Pre-Shift Grace Period Subclass (Subclass 2) .......... 7

              2.     There is No Common Policy Capable of Resolving the
                     Claims of the Post-Shift Grace Period Subclass (Subclass 3) ........ 9

         B.     The Grace Period Subclasses Do Not Satisfy The Requirements Of
                 Rule 23(b)(3) ............................................................................................... 11

              1.     The Grace Period Subclasses Do Not Satisfy The
                     Predominance Requirement Of Rule 23(b)(3) ............................. 12

               2.     The Grace Period Subclasses Do Not Satisfy The
                     Superiority Requirement of Rule 23(b)(3) ................................... 14

CONCLUSION ........................................................................................................................ 15

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re: Autozone, Inc.,* No. 3:10-MD-02159-CRB,
  2016 WL 4208200 (N.D. Cal., Aug. 10, 2016) ................................................................ *passim*

*Bacon v. Honda of Am. Mfg., Inc.,*
  205 F.R.D. 466 (S.D. Ohio 2001) ....................................................................................15

*Donaldson v. Microsoft Corp.,*
  205 F.R.D. 558 (W.D. Wash. 2001) .................................................................................15

*Forrand v. Federal Exp. Corp.*
  No. CV 08-1360 DSF PJWX, 2013 WL 1793951 (C.D. Cal., Apr. 25, 2013),
  *aff'd sub nom. Green v. Federal Exp. Corp.*, 614 Fed. Appx. 905 (9th Cir.
  2015) ...............................................................................................................................3, 15

*Garcia v. Sun Pac. Farming Co-op,*
  No. CV F 06-0871, 2008 WL 2073979 (E.D. Cal. May 14, 2008)...................................15

*Gen. Tel. Co. of S.W. v. Falcon,*
  457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) .....................................................5

*Hanlon v. Chrysler Corp.,*
  150 F.3d 1011 (9th Cir. 1998)..........................................................................................12

*Kirola v. City of San Francisco,*
  No. C 07–03685, 2011 WL 1330853 (N.D. Cal. Apr. 4, 2011)........................................15

*Marlo v. United Parcel Serv., Inc.*,
  251 F.R.D. 476 (N.D.Cal.2008) .........................................................................................5

*Martinez v. Combs*
  49 Cal.4th 35 (2010) .....................................................................................................7, 14

*Morillion v. Royal Packing Co.*,
  22 Cal.4th 575 (2000) .........................................................................................................7

*Ortiz v. CVS Caremark Corp.*,
  No. C-12-05859, 2013 WL 6236743 (N.D. Cal. Dec. 2, 2013)...................................10, 12

*Pryor v. Aerotek Scientific,*
  LLC 278 F.R.D. 516 (C.D. Cal. 2011). ......................................................................14, 15

*See's Candy Shops, Inc. v. Superior Court,*
  210 Cal. App. 4th 889 (2012)....................................................................................3, 6, 15

*Stiller v. Costco Wholesale Corp.*,
    *298 F.R.D.* 611 (S.D. Cal. 2014) ............................................................................................3, 15

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S.Ct. 1036 (2016) ..........................................................................................................13

*United Steel v. ConocoPhillips*,
    593 F.3d 802 (9th Cir. 2010) ...............................................................................................12

*Wal–Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ...........................................................................................................5, 6

*York v. Starbucks Corp.*
    No. CV 08–07919, 2011 WL 8199987 (C.D.Cal. Nov. 23 2011) ....................................10, 12

**Rules**

Fed. R. Civ. P. 23 .......................................................................................................................5

Fed. R. Civ. P. 23(a) .............................................................................................................5, 13

Fed. R. Civ. P. 23(a)(2) .....................................................................................................6, 12, 13

Fed. R. Civ. P. 23(b)(3) ..................................................................................................12, 13, 15

Fed. R. Civ. P. 23(b)(3)(D) .......................................................................................................15

1

**SUMMARY OF ARGUMENT**

2
3
4
5
6
7
8
9
10
11

After this Court granted Plaintiffs' Motion for Class Certification in April 2014, the parties engaged in further discovery to test the accuracy of Plaintiffs' contention that US Airways has a policy and practice of not paying Fleet Service employees for time worked during "grace periods" before and after their scheduled shifts (the "Grace Period Claim").[1]  This post-certification discovery has confirmed that no such common policy exists.  The evidence also shows that resolving the question of whether class members performed any work during grace periods will require resort to highly fact-based, individualized inquiries.  Accordingly, there is no commonality across the class, individual issues will predominate, and resolving the Grace Period Claim on a classwide basis will be unmanageable.  The subclasses premised on this allegation (the "Grace Period Subclasses") must therefore by decertified.

12
13
14
15
16
17
18
19
20
21
22
23

The Grace Period Claim is based on US Airways' electronic timekeeping practice of initially coding certain time immediately before and after class members' scheduled shifts as unpaid time.  This time is referred to as a "grace period," during which Fleet Service employees can be clocked-in but, because the time is outside of their normal working hours, the default assumption is that they are performing no work and accordingly the time is, by default, unpaid.  The record in this case demonstrates that there is usually no need for Fleet Service employees to engage in any work-related activities before or after their shifts, as their shifts are specifically scheduled to allow for adequate time around flight schedules.  For example, one Fleet Service employee testified that his shift begins at 4:45am, but the first flight he works does not depart until 6:30am, and he does not begin preparing for that flight until around 5:30am, well ***after*** his shift has begun.  (Declaration of Susannah K. Howard in Support of US Airways' Motion to Decertify Subclasses (filed concurrently herewith), Ex. 1 (Deposition of Glen Brown) at 86:16-

24
25
26
27
28

[1] Following class certification, the parties agreed to engage in a limited number of class member depositions to test the reliability of the statements in the declarations submitted by each party at the class certification stage.  Plaintiffs also requested the depositions of two managers from California stations—one from SFO and one from LAX.  A manager from each station—Soniya Kullar from SFO, and Christina Crowl from LAX—was deposed by Plaintiffs' counsel.  In addition, after class certification but prior to commencing class member and manager depositions, US Airways produced over 69,000 pages of the paper forms used at stations across California to report additional work time.  (Howard Decl. ¶¶ 2-3.)

US AIRWAYS' MOTION TO<br>DECERTIFY SUBCLASSES<br>CASE NO. 3:12-CV-05860 CRB

92:8; 90:6-91:39.)[2] He further testified that he often finishes all of his work before the end of his shift at 1:15pm. If his work is done, he may leave his work area before the end of his shift to, for example, pick up flight tickets from other airlines for personal travel, but because there is a long line at the ticket counter, he may not return to clock-out until several minutes after the end of his shift. When presented with his timekeeping records showing that he had clocked-out four minutes late one day (*i.e.* at 1:19pm) and that these four minutes were unpaid, he speculated that this was the reason. (*Id.* at 72:10-73:25.) He also testified that he sometimes clocks-out late because he is having a personal conversation with a co-worker. (*Id.* at 92:9-93:4.) This testimony is not unique. There is ample evidence that Fleet Service employees often clock-in early or clock-out late for personal reasons and spend this time engaged in personal activities, such as socializing with co-workers, going to the gym, watching television, and picking up airline tickets from other airlines.

If Fleet Service employees do perform any work during grace periods (in the foregoing example, prior to 4:45am or after 1:15pm), this additional work time is converted to paid time so long as it is communicated to management (who are not typically present to observe the additional work being performed). While the specific process of reporting additional work time varies across airports in California (referred to as "stations"), class members uniformly testified that they are aware of the process at their particular station and use it to report additional work time. That class members use their station-specific process to report additional work time is further confirmed by the documentary evidence—US Airways has produced over **69,000** pages of paper records that were used across California stations for this purpose. When additional work time is reported, it is paid. Indeed, no class member could identify a single instance in which they reported additional work time, but were not paid for it. Managers from San Francisco ("SFO") and Los Angeles ("LAX")—the only managers deposed by Plaintiffs—both testified that they

---

[2] All subsequent references to exhibits are references to exhibits to the Howard Declaration, unless otherwise stated. When referencing deposition testimony, the deponents last name will be used, with the Howard Declaration exhibit number in brackets, i.e. "Brown (Ex. 1)", followed by the page and line numbers of the testimony. When referencing witness declarations attached to the Howard Declaration, the witness's last name will be used, with the Howard Declaration exhibit number in brackets, i.e. "Soto Decl. (Ex.11)," followed by the paragraph number.

US AIRWAYS' MOTION TO
DECERTIFY SUBCLASSES
CASE NO. 3:12-CV-05860 CRB

1    approve payment for any and all additional work time that is reported.  As a manager from SFO

2    testified, "[w]e don't question it.  We just pay it."  (Kullar (Ex. 7) 51:23-24.)

3            On this record, US Airways' practice of initially applying a grace period code to certain

4    time before and after scheduled shifts is not, on its own, capable of resolving the Grace Period

5    Claim on a classwide basis. This is because simply looking at time coded as a grace period,

6    without more, does not answer the key question at issue:  Was this time *worked*?  In the absence

7    of any common method for identifying which unconverted grace period minutes may represent

8    compensable work time, resolving the Grace Period Claim for all members of the Grace Period

9    Subclasses would require this Court to engage in over 500 mini-trials to determine which, if any,

10   class members actually performed compensable work during grace periods.  The Grace Period

11   Subclasses therefore do not satisfy the commonality, predominance or superiority/manageability

12   requirements of Rule 23, and must be decertified.  *See Forrand v. Federal Exp. Corp.* No. CV 08-

13   1360 DSF PJWX, 2013 WL 1793951, at *4 (C.D. Cal., Apr. 25, 2013), *aff'd sub nom. Green v.*

14   *Federal Exp. Corp.*, 614 Fed. Appx. 905 (9th Cir. 2015) (denying class certification of similar

15   claim because it "'raise[d] factual questions' involving whether each individual "employee was in

16   fact working and/or whether the employee was under the employer's control during the grace

17   period.'") (quoting from *See's Candy Shops, Inc. v. Superior Court*, 210 Cal. App. 4th 889, 909

18   (2012)); *In re: Autozone, Inc.*, No. 3:10-MD-02159-CRB, 2016 WL 4208200, at *12 (N.D. Cal.,

19   Aug. 10, 2016) (decertifying class where defendant "did not have a uniform written policy in

20   place throughout the class period and because the evidence of employee rest break practices does

21   not reflect a consistent rest break practice [across the class.]"); *Stiller v. Costco Wholesale Corp.,*

22   298 F.R.D. 611, 628 (S.D. Cal. 2014), leave to appeal denied (Aug. 22, 2014) (decertifying class

23   because "there [was] no classwide method, of determining whether, how often, and for how long

24   class members actually experienced unpaid … time as a result of the Alleged Policy.").

25

26

27

28

US AIRWAYS' MOTION TO
DECERTIFY SUBCLASSES
CASE NO. 3:12-CV-05860 CRB

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

**I.    FLEET SERVICE SCHEDULING AND WORK DUTIES**

Plaintiffs are former US Airways Fleet Service employees who were employed at San Francisco International Airport ("SFO").  Fleet Service employees are primarily responsible for servicing incoming and outgoing passenger aircraft by loading and unloading bags, mail and cargo, cleaning the aircraft, as well as waving in and pushing back aircraft.  (Henson (Ex. 3) 14:20-15:3; Kortz (Ex. 6) 35:10-19; Massey (Ex. 5) 25:24-26:2, 37:22-38:11; Roberts (Ex. 4) 12:15-22; Sausa (Ex. 2) 25:8-26:1.)  Their work is therefore dependent on flight schedules.  Pursuant to the collective bargaining agreement between US Airways and their Union, Fleet Service employees obtain their regular work schedule or "shifts" through a bidding process that occurs at least three (3) times per year.[3]  Each station establishes its own work schedule or "bid," which corresponds to the station's anticipated flight schedule for the bid period.  (Soto Decl. (Ex.11) ¶ 5; Crowl (Ex. 8) 21:13-22:6, 32:22-33:16, 34:21-35:9; Kullar (Ex. 7) 39:13-25.)  Managers try to ensure that there is a sufficient gap of time between when Fleet Service employees are scheduled to start their shifts and when their first flight is scheduled to either arrive or depart, to provide Fleet Service employees with sufficient time to prepare for their first flight *after* their start time.  (Soto Decl. (Ex. 11) ¶ 6.)[4]  Similarly, managers try to ensure that there is a sufficient gap of time between the last flight Fleet Service employees are assigned to work and their scheduled end time, so that Fleet Service employees will have sufficient time to finish working their last flight before they are scheduled to stop working.  (*Id.*)[5]

---

[3] The CBAs in effect during the class period are attached to the Declaration of Adam P. KohSweeney in Support of US Airways Motion for Summary Judgment (filed concurrently herewith) as Exhibits 1A and 1B.  The bid process in the IAM CBA is set forth in Ex. 1A at Article 5, §§ K, L, N & Article 7. This process is substantively similar to the process set forth at § 12H4 of the TWU CBA, through which employees bid for schedules based primarily on date-of-hire seniority.  *See also* KohSweeney Ex. 1 ¶ 6.

[4] US Airways gathered declarations from Fleet Service employees prior to class certification that confirm this practice. (*See* Bennett Decl. (Ex. 12) ¶ 9; Bernal Decl. (Ex. 13) ¶ 9; Brown Decl. (Ex. 14) ¶ 9; Del Pielago Decl. (Ex. 15) ¶ 9; Hines Decl. (Ex. 16) ¶ 8; Lee Decl. (Ex. 18) ¶ 9; Puckett Decl. (Ex. 20) ¶ 9; Salmon Decl. (Ex. 22) ¶ 9; Sausa Decl. (Ex. 23) ¶ 8; Swartwood Decl. (Ex. 25) ¶ 9; Venturini Decl. (Ex. 27) ¶ 9; Regalado Decl. (Ex. 21) ¶ 9.)

[5] *See also* (Hines Decl. (Ex. 16) ¶ 8; Lee Decl. (Ex. 18) ¶ 9; Puckett Decl. (Ex 20) ¶ 9; Regalado (Ex. 21) ¶ 9.)

1    Fleet Service employees are assigned to work particular flights as part of a team.  (Massey

2    (Ex. 5) 38:19-21; Crowl (Ex. 8) 42:4-1, 48:16-22.)  On each team, there are several assignments.

3    For example, some Fleet Service employees are assigned to work in the "bins" of the aircraft

4    unloading or loading bags.  (Kortz (Ex. 6) 21:16-22:11.)  Others may be assigned to clean aircraft

5    lavatories or work in the bag room loading bags onto a conveyer belt, while others are assigned to

6    push-back the aircraft.  (*Id.* at 35:10-19; Massey (Ex. 5) 25:24-26:2, 37:22-38:11; Roberts (Ex. 4)

7    12:15-22; Sausa (Ex. 2) 25:8-26:11.)  Fleet Service Lead Agents ("Leads") are part of the same

8    bargaining unit who lead and direct the work of other Fleet Service employees.  (Kortz (Ex. 6)

9    27: 8-22; KohSweeney Decl. Ex. 1A at Art. 4 § D.)  Each team has a Lead, and it is typically the

10   Lead who makes assignments.  (Kullar (Ex. 7) 29:8-14; Crowl (Ex. 8) 42:1-4, 42:12-20, 45:20-

11   46:4.)  There is not always a manager on duty for every shift, and, even when managers are on

12   duty, they may work in offices that are in a different part of the terminal.  (Kortz (Ex. 6) 30:7-20;

13   Kullar (Ex. 7) 15:17-16:19, 27:22-28:9; Brown (Ex. 8) 91:13-16.)

14          When Fleet Service employees are working outdoors, on the tarmac, they are required to

15   wear brightly-colored safety vests, as well as hearing protection in the form of headphones or

16   earplugs.  (Brown (Ex. 1) 62:22-63:13.)  Fleet Service employees can take their safety vests and

17   hearing protection home with them, or leave them in their lockers at work.  (*Id.* at 87:11-88:10**.**)

18   Fleet Service employees are required to wear a US Airways uniform during their shifts, which

19   they can change into and out of either at home or at work (per their preference).  (*Id.*; Kortz (Ex.

20   6)  46:20-21; Massey (Ex. 5) 35:13-25, 36:10-12.)

21   **II.    GRACE PERIODS AND REPORTING ADDITIONAL WORK TIME**

22          In the summer and fall of 2008, US Airways implemented timekeeping software called

23   "Workbrain" at all California stations, which tracks Fleet Service employees work-related time

24   and pay.  (Soto Decl. (Ex. 11) ¶ 7.)  Since Workbrain was implemented, Fleet Service employees

25   have clocked-in and out using an electronic time clock.  (Vail (Ex. 9) 25:9-17; 38:5-39:23. )  The

26   work schedules of Fleet Service employees are programmed into Workbrain for each bid period.

27   If an employee is clocked-in during his or her scheduled shift, Workbrain automatically codes this

28   time as paid time.  (Soto Decl. (Ex. 11) ¶ 8.)  If an employee clocks-in up to 55 minutes before

the start of his or her shift, Workbrain by default codes the minutes between the employee's clock-in time and his or her scheduled start time as an unpaid grace period. (*Id.*) Workbrain has been programmed this way because the default assumption is that Fleet Service employees are not performing work before the start of their scheduled shifts—an assumption that has been confirmed by the evidence in this case. Rather, as set forth below, they clock-in early by choice and spend the time before their shifts engaged in personal activities, such as socializing with co-workers or watching television. Similarly, if a Fleet Service employee clocks-out up to 30 minutes after the end of his or her shift, Workbrain by default codes the minutes between the employee's scheduled end time and the clock-out time as an unpaid grace period. (Soto Decl. (Ex. 11) ¶ 8; Vail (Ex. 9) 50:15-52:9, 55:24-56:12) (use of these default timecodes is hereinafter referred to as US Airways "Grace Period Policy.") Workbrain has been programmed this way because the default assumption is that Fleet Service employees are not performing work after the end of their scheduled shifts. Again, as set forth below, the evidence confirms that Fleet Service employees remain clocked-in at times while engaged solely in personal activities.

When Fleet Service employees do perform any work outside of their scheduled shifts—whether or not this work falls within a pre-shift or post-shift grace period—each California station has station-specific policies and practices in place to ensure that they are paid for this additional work time. (Soto Decl. (Ex. 11) ¶¶ 8-9; Vail Decl. (Ex. 10) ¶ 6; Vail (Ex. 9) 18:2-19:22; 51:6 -51:23.) These policies and practices are longstanding, and are well understood and commonly used by Fleet Service employees. Indeed, every Fleet Service employee who was deposed after class certification was well aware of the practice at their particular station for reporting any time worked outside of a scheduled shift, and used the practice on a regular basis. (Henson (Ex. 3) 89:7-91:19,74:7-75:15; Brown (Ex. 1) 43:2-45:19, 95:2-96:11; Kortz (Ex. 6) 37:11-40:16, 89:2-11,90:91:8; Sausa (Ex. 2) 51:18-53:12; Massey (Ex. 5) 60:10-67:8, 114:22-115:4; Roberts (Ex. 4) 33:2-35:9.)[6]

---

[6] This testimony is consistent with the declarations of putative class members gathered by US Airways pre-certification. (*See*, e.g., Bennett Decl. (Ex. 12) ¶¶ 12-13; Huang Decl. (Ex. 17) ¶ 12; Lee Decl. (Ex. 18) ¶¶ 13-14; Regalado Decl. (Ex. 21) ¶ 12.)

At most stations, Fleet Service employees record additional work time on paper forms, which vary across stations. (Vail Decl. (Ex. 10) ¶ 6.) At most stations, Leads verify the additional work time reported by initialing or signing the forms. (*Id.*; *see also* Henson (Ex. 3) 89:7-22; Townsend Decl. (Ex. 26) ¶ 9; Mendiola Decl. (Ex. 19) ¶ 11.) In some circumstances, Leads complete the forms themselves on behalf of the Fleet Service employees. (Henson (Ex. 3) 89:7-22.) Blank copies of these paper forms are kept in different locations at each station, but they are all readily accessible to Fleet Service employees, within their work area. (Crowl (Ex. 8) 88:4-18; Kullar (Ex. 7) 47:16-22.) At some stations, additional work time can be reported verbally to a Lead or to a manager. (Kortz (Ex. 6) 96:12-97:2; Massey (Ex. 5) 60:5-8; 71:3-12.) At some stations, managers review these forms. However, they are not subjected to special scrutiny. As a manager at SFO testified, "we don't question it. We just pay it." (Kullar (Ex. 7) 51:23-24.) Administrators or managers at each station use Workbrain to convert the time outside of an employee's scheduled shift that is reported as work time, to paid time. (Vail (Ex. 10) ¶ 6.)

US Airways has produced over 69,000 pages of completed copies of the various paper records used across California stations to report additional work time. (Howard Decl. ¶ 3.) In addition, a review of class members' Workbrain timekeeping records confirms that unpaid grace periods are routinely converted by US Airways to paid time, when additional work is reported. Records from Workbrain show that grace periods were converted to paid time on 23,963 occasions from June 22, 2008 to May 10, 2013, which amounts to an average of 93.6 conversions per calendar week across all California stations. (Czechowski Decl. (Ex. 28) ¶¶ 10-11.)

## III.   CLASS CERTIFICATION

When this Court granted Plaintiffs' Motion for Class Certification on April 4, 2012 (Dkt. 75), the court did not specify any class definition in its order. (*Id.*) Plaintiffs sought certification of a class of California-based Fleet Service employees, as well as subclasses that distinguish between their two core theories of liability. In addition to seeking unpaid wages for work allegedly performed during grace periods, Plaintiffs also allege that they and the class are entitled to recover overtime pay for hours worked as a result of US Airways' shift trade policy ("Shift Trade Claim"). The Shift Trade Claim and the Grace Period Claim are based on completely

separate alleged policies and practices and, accordingly, Plaintiffs sought certification of separate subclasses related to each claim, as well as subclasses relating to their dependent, penalty claims. The subclasses relevant to the Grace Period Claim are as follows:

> **Subclass No. 2**: Fleet Service Agents who, while clocked-in, engaged in pre-shift work and are owed compensation for hours worked.

> **Subclass No. 3**: Fleet Service Agents who, while clocked-in, engaged in post-shift work and are owed compensation for hours worked.

(Dkt. 64 at 1-2.)

US Airways seeks to decertify Subclasses 2 and 3 (the "Grace Period Subclasses"), as well as Subclasses 4-7, which relate to Plaintiffs' penalty claims, to the extent they depend upon Subclasses 2 and 3. US Airways does not seek to decertify Subclass 1, which pertains to the Shift Trade Claim, nor Subclasses 4-7, to the extent they depend on Subclass 1.

**ARGUMENT**

In deciding whether to decertify a class, a court may consider "subsequent developments in the litigation." *Gen. Tel. Co. of S.W. v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). "In considering the appropriateness of decertification, the standard of review is the same as a motion for class certification: whether the Rule 23 requirements are met." *Marlo v. United Parcel Serv., Inc.,* 251 F.R.D. 476, 479 (N.D.Cal.2008).

**I.     THE GRACE PERIOD SUBCLASSES DO NOT SATISFY THE REQUIREMENTS OF RULE 23 AND MUST THEREFORE BE DECERTIFIED.**

**A.     The Grace Period Subclasses Do Not Satisfy The Commonality Requirement of Rule 23(a)(2).**

Rule 23(a)(2) allows for class certification only if there are "questions of law or fact common to the class." F.R.C.P. 23(a)(2). This requires a "common contention …of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011). No such common contention exists

1   with respect to the Grace Period Subclasses.  The core contention identified by Plaintiffs—

2   whether class members engaged in compensable pre-shift or post-shift work during time coded as

3   a grace period—cannot be resolved on a classwide basis.  (Dkt. 64 at 10:13-18.)  Contrary to

4   Plaintiffs' allegation at the class certification stage, there is no uniform policy or consistent

5   practice that compels class members to perform compensable work during pre-shift or post-shift

6   grace periods without pay, nor is there evidence that such work even occurs across the class.

7   Rather, grace periods can be used for personal activities, and when work is performed during this

8   time, it is reported and paid.

9           As an initial matter, the policy of initially coding certain pre-shift and post-shift time as

10  unpaid, is lawful in California  As explained by the California Court of Appeal in *See's Candy*,

11  210 Cal. App. 4th at 909:

12          "[U]nder California law a grace period (the time during which an employee punches in
            before his or her compensable pay is triggered) is allowed if the employee is not working
13          or is not under the employer's control.  To the extent an employee claims that he or she
            was not properly paid under this grace period rule, this claim raises factual questions
14          involving whether the employee was in fact working and/or whether the employee was
            under the employer's control during the grace period.
15

16          Accordingly, in order to establish liability, Plaintiffs must establish that class members

17  were "under [US Airways'] control" during grace periods to such a degree that it renders this time

18  compensable, or that US Airways had knowledge of work performed during grace periods, but

19  failed to prevent it.  *See Morillion v. Royal Packing Co.*, 22 Cal.4th 575, 587 (2000) (explaining

20  that it is the level of the employer's control that is dispositive); *Martinez v. Combs*, 49 Cal.4th 35,

21  70 (2010) (explaining that "the basis of liability [on the 'suffer or permit' standard] is the

22  defendant's knowledge of and failure to prevent the work from occurring.").  There is no

23  common, classwide method by which this can be done.

24          At the class certification stage, Plaintiffs alleged that some Fleet Service employees were

25  not familiar with the process of reporting time worked outside of their scheduled shifts and

26  instead believed that they were paid strictly by their clock-in and clock-out times.  (Dkt. 64 at 8:1-

27  3).  To the contrary, **all** Fleet Service employees who were deposed after class certification were

28  well aware of the practice at their particular station for reporting time worked outside of a

scheduled shift, and used these practices on a regular basis.  (*See* supra at 3:20-25.)  Indeed, post-certification US Airways produced over 69,000 pages of paper forms from stations in California that reflect the reporting and recording of time worked by Fleet Service employees outside of their scheduled shifts.  (Howard Decl. at 3.)  Thus, neither the Grace Period Policy itself, nor a lack of familiarity with the process for reporting additional work time is an issue common to the Grace Period Subclasses capable of driving a classwide resolution to the Grace Period claims.  The following two subsections further address the lack of commonality specifically in regards to each of the pre-shift and post-shift Grace Period Subclasses, respectively.

        **1.**       **There is no common policy capable of resolving the claims of the pre-shift Grace Period Subclass (Subclass 2).**

With respect to pre-shift grace periods, Plaintiffs alleged both (1) that Fleet Service employees were required to perform work before their start times such as "checking flight schedules, meeting and conferring with supervisors, and putting on safety gear"; and (2) that this time is never compensated by US Airways.  (Dkt. 64 at 7:6-7).  Post-certification evidence establishes that neither allegation is true.  To start, **all** class members deposed testified that the procedures for reporting additional work time apply equally to pre-shift work time—there is no bar on compensating class members for pre-shift work.  (Roberts (Ex.4) 34:17-35:9; Massey (Ex. 5) 70:16-71:12; Sausa (Ex. 2) 111:1-112:4; Kortz (Ex. 6) 37:11-15; Henson (Ex. 3) 74:7-13.)  Thus, to the extent that any Fleet Service employee begins work early, all they need to do to get paid for this time is report it pursuant to their station-specific practice.  (*See*, e.g. Roberts (Ex. 4) 34:4-19.)  In addition, both Fleet Service employees and managers testified that Fleet Service employees arrive and clock-in early for their own, personal reasons and that they can and do use the time before their shifts exclusively for personal activities, during which they are not subject to US Airway's control.[7]  Moreover, managers are often not present to observe Fleet Service employees during this time.  Thus, while there is typically no need for Fleet Service employees to

---

[7] Significantly, even Plaintiffs do not contend that all unconverted grace period minutes represent compensable work time.  In their Motion for Class Certification, they argued that only up to 15 minutes of pre-shift grace period time represented compensable time.  (Dkt. 64 at 14:10-13.)

begin performing work tasks before their start time, even to the extent any class member did use grace period time to "prepare" for work and did not report it, there is no classwide evidence that US Airways knew or should have known that this was occurring.

For example, Glen Brown, who works at Ontario ("ONT"), testified that while he typically arrives to work early due to his own personal preference, (Brown (Ex. 1) 91:17-20), there is no need for him or for any class member at ONT to begin performing any work before their scheduled start times. (*Id*. at 86:16-92:8; 90:6-14; 90:25-91:3.) The first flight departing from ONT leaves at 6:30am. Brown testified that, to service this flight, he and the other Fleet Service employees on his shift do not need to begin any work-related tasks until 5:30am—well **after** their scheduled start time of 4:45am. (*Id*. at 90:15-24.) There is not even a US Airways manager on-duty at the beginning of this morning shift. (*Id*. at 91:13-16.) Brown testified that he spends the time after his arrival and before his scheduled start time on personal activities, such as talking and watching the news. (*Id.* at 39:4-7.)

Monica Sausa, based out of San Jose ("SCJ"), explained that she typically arrives and clocks-in 25 minutes early due to her own concerns over traffic. (Sausa (Ex.2) 110:16-18; 112:5-13.) When asked how she uses this time before her shift, she said: "Sometimes if I -- if I clocked in early, I'd sit and gab, look at Workbrain or talk to the people and gab some more and… We have the TV on or some of us would go on our cell phones." (*Id*. at 104:10-15.) The flight schedule at SJC has recently changed and there is now sometimes a plane already on the ground when she arrives. However, she is not assigned to work that flight. (*Id*. at 104:20-106:13.) Sausa explained that if she helps with that flight before the start of her shift, she can complete a Time Adjustment Slip to report this additional time and will be paid for it. (*Id*. at 111:1-112:4.)

Marvin Henson, a Lead at SFO testified that he arrives to work early not because of any requirement by US Airways, but simply because the shuttle bus from the free employee parking lot where he chooses to park drops him off at the terminal 15 minutes before his shift. (Henson (Ex. 3) 62:8-63:25.) He further testified that there is no manager present when he arrives at 4:45am for his morning shift at 5:00am, but that if he, as a Lead, asked a Fleet Service employee to start performing work early, he would make sure that their time was recorded and paid. (*Id*. at

69:7-9 & 74:7-13.)  He does not hold pre-shift meetings or safety briefings with Fleet Service employees before the start of their shifts, and he could not recall ever discussing any job duties with Fleet Service employees before the start of their shifts.  (*Id*. at 123:15-23.)

In addition, SFO Manager Soniya Kullar testified that her office is not near the Fleet Service employee work area and that she is not typically present for the start of their shifts. (Kullar (Ex. 7) 31:22-32:6.)  She further testified that for some shifts, there has been no manager on duty at all at SFO.  (*Id*. at 27:14-28:8.)  LAX Manager Christina Crowl testified that if she sees Fleet Service employees "doing something that's before the start of their shift, [she will] remind them that they haven't started yet.  Or [that] they can wait until their start time to discuss a certain issue that they may have."  (Crowl (Ex. 8) 72:71:25-72:16.)

There is no evidence of a policy requiring class members to perform work before their scheduled shifts without pay, nor is their evidence that FSAs do in fact perform pre-shift work that US Airways does or should know about, but that US Airways instead chooses to ignore. Accordingly, the pre-shift Grace Period Subclass lacks commonality and should be decertified. *In re Autozone*, 2016 WL 4208200, *10-13; *York v. Starbucks Corp.* No. CV 08–07919, 2011 WL 8199987, at *24, *28 (C.D.Cal. Nov. 23 2011); *Ortiz v. CVS Caremark Corp.*, No. C-12-05859, 2013 WL 6236743, at *9-10 (N.D. Cal. Dec. 2, 2013).

> **2.      There is no common policy capable of resolving the claims of the post-shift Grace Period Subclass (Subclass 3).**

While Plaintiffs acknowledge procedures to report post-shift work time, Plaintiffs argued that supervisors routinely refused to sign-off on payment for all post-shift work.  (Dkt. 64 at 7:24-8:1.)  Plaintiffs further argued that Fleet Service employees never engage in personal activities after the end of their shifts while clocked-in, reasoning that post-shift grace period minutes must represent compensable time.  (Dkt. 69 at 8:9-1.)  Both allegations are refuted by the evidence.

Importantly, because class members work in a variety of locations where managers are not typically present (i.e. different airport gates and bag rooms), class members are expected to self-report any additional work time.  At most stations, this additional time is verified by other class members—Leads—who have absolutely no incentive to minimize the additional work time of

their colleagues.  Marvin Henson, an SFO Lead, testified that he signs-off on all additional time worked by Fleet Service employees on his teams, and he did not dispute a practice that other SFO Leads have attested to—that they **round up** additional work time, resulting in **overpayment** to their co-workers.  (Henson (Ex. 3) 111:2-112:16; 118:7-119:3; *see also* Townsend Decl. (Ex. 26) ¶ 9; Mendiola Decl. (Ex. 19) ¶ 11.)[8]

Time that is reported is paid by management.  Soniya Kullar, an SFO manager, testified that she approves payment for any and all time recorded on Exception Reports—even for only one minute of additional work time, and even in circumstances where a Lead has not verified the time reported.  (Kullar (Ex. 7) 49:5-22; 51:4-24.)  As Kullar testified, "we don't question it.  We just pay it."  (*Id*. at 51:23-24.)  LAX manager Christina Crowl testified that she has approved even one minute of additional work.[9]  (Crowl (Ex. 8) 89:9-23.)  At ONT, where paper forms are not used, Glen Brown testified that the Station Manager, Sherrie Cairns, follows up with employees verbally about additional work time and pays them for this time.  (Brown (Ex. 1) 95:2-95:15.)  He could think of only one occasion when Ms. Cairns mistakenly failed to convert grace period time to paid time, but this was immediately corrected once Brown and others advised her that they had been working during that time.[10]  (*Id*. at 95:16-25.)  Indeed, none of the class members deposed could identify a single instance in which they reported additional work time, but were not paid for it.  (*See*, e.g. Roberts (Ex. 4) 42:5-15; Henson (Ex. 3) 131:8-16; Kortz (Ex. 6) 63:1-65:12; Massey (Ex. 5) 57:10-14.)  In light of this testimony, to the extent any class member feels that he or she was not paid for additional work time, this would be an individual,

---

[8] Christina Crowl similarly testified that, on occasions when Fleet Service employees at LAX finish their job duties just a couple of minutes after their scheduled end time, they will hang out in the breakroom engaged in personal activities, and wait to clock-out until 10-15 minutes past the end of their shift, so that they receive more than just a few minutes of extra-compensation. (Crowl 129:1-24.)

[9] Crowl testified that throughout her six years of employment at US Airways, she has only declined to approve additional work time reported by one Fleet Service employees, on one occasion, explaining that while this employee had reported that he had spent 30 minutes between two shifts working a particular flight, Crowl herself had assisted with that flight and had observed that this employee was not present.  (Crowl 131:8-24.)

[10] Monica Sausa and Jay Kortz, who both work at SJC, also testified that when there was any oversight in inputting additional work time, these mistakes were immediately corrected.  (Sausa 96:24-98:25; Kortz 60:14-65:12.)

1  not a classwide issue.

2  The post-certification testimony similarly does not support Plaintiffs' contention that, on a

3  classwide basis, Fleet Service Employees are **always** engaged in work-related tasks while they

4  remain clocked-in past the end of their shifts.  Glen Brown testified that he and other FSAs

5  engage in personal discussions and other personal activities (such as picking up flight tickets for

6  personal travel) while they are clocked-in both before and after their shifts.  (Brown (Ex. 1)

7  72:14-73:10.)  Michelle Massey also testified that she would book flights for personal travel on

8  the computer in the breakroom before or after her scheduled shift, and would obtain flight passes

9  from other airlines after the end of her shift, without first clocking out.  (Massey (Ex. 5) 121:7-

10  123:22.)  Monica Sausa testified that she and her co-workers often have personal conversations,

11  watch television or spend time on their cell phones while they are clocked-in before or after their

12  scheduled shifts.  (Sausa (Ex. 2) 118:1-119:8.)  Sausa routinely spends time at the end of her shift

13  retrieving empty soda cans from airplane garbage bins that she then returns to recycling centers

14  for money, which she uses for her family, and this has caused her to clock-out past the end of her

15  shift.  (*Id.* 70:9-72:25.)  Christina Crowl testified that she observes FSAs going to the gym, going

16  to pick up flight tickets from other airlines, watching sports on the breakroom television, and

17  socializing, all while clocked-in outside of their scheduled shifts.  (Crowl (Ex. 8) 129:25-131:4;

18  *see also* Kullar (Ex. 7) 78:14-21.)

19  Given that class members often engage in personal activities during grace periods and

20  given that managers rely on class member to self-report additional work time when it occurs, and

21  pay for this time when it is reported, there is no classwide method of determining whether any

22  work was performed during post-shift grace periods without pay.  The post-shift Grace Period

23  Subclass thus does not satisfy Rule 23(a)(2).  *See In re Autozone*, 2016 WL 4208200, *10-13,

24  *York* , 2011 WL 8199987, at *24, *28; *Ortiz*, 2013 WL 6236743, at *9-10.

25  **B.**      **The Grace Period Subclasses Do Not Satisfy The Requirements Of Rule 23(b)(3).**

26  A class action may only be maintained under Rule 23(b)(3) if "the court finds that the

27  questions of law or fact common to class members predominate over any questions affecting only

28

1    individual members, and that a class action is superior to other available methods for fairly and

2    efficiently adjudicating the controversy."  *United Steel v. ConocoPhillips*, 593 F.3d 802, 807 (9th

3    Cir. 2010).  The Grace Period Subclasses do not satisfy either of these requirements.

### 1.    The Grace Period Subclasses Do Not Satisfy The Predominance Requirement Of Rule 23(b)(3)

5        The predominance requirement of Rule 23(b)(3) "calls upon courts to give careful

6    scrutiny to the relation between common and individual questions in a case."  *Tyson Foods, Inc.*

7    *v. Bouaphakeo* 136 S.Ct. 1036, 1045 (2016).  "An individual question is one where members of a

8    proposed class will need to present evidence that varies from member to member, while a

9    common question is one where the same evidence will suffice for each member to make a prima

10   facie showing or the issue is susceptible to generalized, class-wide proof."[11]  *Id.*

11       Because there is no evidence of a classwide policy requiring class members to work

12   without pay, resolving the merits of the Grace Period Claim will require consideration of

13   individualized evidence.  Deciding the merits of the Grace Period Claim with respect to each

14   class member will require inquiries into: (1) whether the class member performed alleged work

15   activities during a grace period that remains unpaid; (2) if so, whether the alleged work activities

16   qualify as compensable "work" under California law.  Answering these questions will require

17   resort to countless individual inquiries because there are no consistent, classwide allegations

18   regarding the type of pre-shift or post-shift work allegedly performed without pay, or the

19   circumstances in which this work was allegedly performed, nor are their consistent, classwide

20   allegations regarding US Airways' knowledge of this alleged unpaid work.

21       For example,  Plaintiffs argued in their Motion for Class Certification that class members

22   engaged in pre-shift activities such as "checking flight schedules, meeting and conferring with

23   supervisors, and putting on safety gear."  (Dkt. 64 at 7:4-8.)  However, as discussed above, there

---

[11] The predominance analysis under Rule 23(b)(3) is more stringent and rigorous than the commonality requirement of Rule 23(a)(2). *methods*

*Hanlon v. Chrysler Corp* 150 F.3d 1011, 1022 (9th Cir. 1998); *see also Pryor v. Aerotek Scientific*, LLC 278 F.R.D. 516, 530 (C.D. Cal. 2011).

1    is evidence that class members do not need to prepare for work before their start times, and that

2    they clock-in before their shifts for personal reasons and engage in personal activities during pre-

3    shift grace periods.  (*See*, *supra* at subsection I.A.1.)  The time Fleet Service employees actually

4    need to start any work tasks depends upon the arrival or departure time of their first flight and

5    their particular assignment for that day, and thus necessarily varies widely across the class.  Thus,

6    to the extent that any class member contends that they needed to start preparing early because

7    there was an insufficient gap of time between their start time and the arrival or departure time of

8    their first flight, resolving this allegation would require comparing that class member's schedule

9    and assignments against flight schedules, for each day of the class period.

10           Plaintiffs may try to argue that even if class members engaged in unpaid pre-shift work

11    during grace periods that was not strictly necessary or required, to the extent any class member

12    did any work-related task before their shift during a grace period, they should still be

13    compensated on the theory that US Airways "suffered or permitted" this alleged "work" to occur.

14    But even under the "suffer or permit" standard, Plaintiffs must still establish that US Airways

15    knew or should have known that the "work" was occurring.  *Martinez,* 49 Cal.4th 35 at 70.

16    Plaintiffs cannot make this showing on a classwide basis, given the evidence that managers are

17    often not present to observe what Fleet Service employees are doing.  This is precisely why US

18    Airways has established practices at each station for Fleet Service employees to self-report any

19    additional work time.  In instances where alleged work time went unreported by a class member

20    for some reason, resolving whether any US Airways manager knew or should have known about

21    it would require resort to individualized proof.

22           With respect to post-shift time, Plaintiffs have alleged that Fleet Service employees "often

23    work past their scheduled shifts because of the nature of the airline industry."  (Dkt. 64 at 7:16-

24    18.)  But again, there is ample evidence that many class members stay clocked-in while engaging

25    in personal activities, so it is not true that all post-shift grace periods represent compensable time.

26    As with alleged pre-shift work time, resolving the issue of whether class members were required

27    to finish work tasks past the end of their shifts would require comparing each class member's

28    schedule and assignments for each day to the flight schedule at their station for that day.  As with

1    pre-shift grace periods, managers are often not present to observe class members at the end of

2    their shifts and so, establishing that US Airways knew or should have known of alleged post-shift

3    work that went unreported will similarly require resort to individualized proof.

4            In light of the many individualized inquiries required to resolve the Grace Period Claim,

5    the Grace Period Subclasses do not satisfy the predominance requirement and should thus be

6    decertified.  *See Forrand*, 2013 WL 1793951, at *3-4 (denying class certification of a nearly

7    identical grace period claim ); *In re Autozone*, 2016 WL 4208200, *10-13; *Stiller v. Costco*

8    *Wholesale Corp.*, 298 F.R.D. 611, 626-630 (S.D. Cal. 2014), *leave to appeal denied* (Aug. 22,

9    2014); *Garcia v. Sun Pac. Farming Co-op*, No. CV F 06-0871, 2008 WL 2073979, at *5 (E.D.

10   Cal. May 14, 2008); *Pryor,* 278 F.R.D. at 530-536.

11                   **2.      The Grace Period Subclasses Do Not Satisfy The Superiority**
                              **Requirement of Rule 23(b)(3)**

12           "In addition to predominance, Rule 23(b)(3) requires a court to find that 'a class action is

13   superior to other available methods to fairly and efficiently adjudicating the controversy.'

14   Pertinent to that determination are 'the likely difficulties in managing a class action.'"  *In re*

15   *Autozone*, 2016 WL 4208200, at *13.  The predominance of individual rather than common issues

16   similarly precludes Plaintiffs from establishing that a class action provides a superior means of

17   adjudicating the Grace Period Claim.  *Pryor*, 278 F.R.D. at 537.  As explained above, simply

18   looking at timekeeping records of class members and pointing to grace periods that remain coded

19   as unpaid time cannot resolve the Grace Period Claim on a classwide basis.  This is because there

20   is no evidence of a uniform policy requiring Fleet Service employees to perform work without

21   pay.  Because there is no evidence of a uniform policy, the testimony of one class member that

22   she performed work during a grace period for which she was not paid cannot serve as the basis to

23   establish liability for any other class member.  *In re Autozone*, 2016 WL 4208200, at *15-16.

24   Instead, establishing liability on a classwide basis would require, at the very least, hearing

25   testimony from each class member on their memories of performing pre-shift or post-shift work,

26   whether any of this alleged work went unreported, and if so, why—which in turn would require

27   testimony on each station's specific practice for reporting additional work time.  It would also

28

1  require cross-checking this testimony against the 69,000 pages of records of additional work that

2  was reported and paid.  In addition, it would require determining, for each class member, whether

3  any alleged unreported work was required by US Airways or whether US Airways knew or

4  should have known about it, including reviewing each class member's shift schedule and

5  comparing it to the flight schedule at their station, as well as testimony from managers regarding

6  their knowledge of alleged unreported work.  Such a process—engaging in over 500 mini-trials—

7  would be unmanageable.  *See In re Autozone*, 2016 WL 4208200, at *14-15.[12]

8                                      **CONCLUSION**

9           For the foregoing reasons, US Airways Motion should be granted and the Grace Period

10  Subclasses should be decertified.

11     Dated:  October 7, 2016                          O'MELVENY & MYERS LLP

12

13                                                      By:____/s/ Adam P. KohSweeney_____
                                                           Adam P. KohSweeney
14                                                         Attorneys for Defendant US Airways, Inc.

15

16

17

18

19

20

21

22  _____
    [12] To the extent the Grace Period Subclasses are not decertified in their entirety, Leads must be
23  excluded from these subclasses because Plaintiffs may not adequately represent them.  Leads are
    tasked with "leading and directing" other Fleet Service employees.  (KohSweeney Decl. 1A at
24  Art. 4 § D.)  This includes assigning work tasks and, at many California stations, recording and/or
    verifying additional work time.  There is therefore an inherent conflict between Leads and non-
25  Leads over whether Leads required additional work and failed to follow policy and record or
    verify additional work time.  *See, e.g.*, *Donaldson v. Microsoft Corp.*, 205 F.R.D. 558, 568 (W.D.
26  Wash. 2001); *Bacon v. Honda of Am. Mfg., Inc.*, 205 F.R.D. 466, 481 (S.D. Ohio 2001); *Kirola v.
    City of San Francisco*, No. C 07–03685, 2011 WL 1330853 (N.D. Cal. Apr. 4, 2011).

27

28